

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00327-CV

_____

IN THE INTEREST OF S.E. AND E.E., MINOR CHILDREN

On Appeal from the 442nd District Court
Denton County, Texas
Trial Court No. 18-6826-16

Before Sudderth, C.J.; Gabriel and Wallach, JJ.[1]
Memorandum Opinion by Chief Justice Sudderth

---

[1]The Honorable Mike Wallach, Judge of the 348th District Court of Tarrant County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to section 74.003(h) of the government code. *See* Tex. Gov't Code Ann. § 74.003(h).

# MEMORANDUM OPINION

## I. Introduction

S.E. and E.E. were born in Michigan and lived there with their parents—Appellant Father, a citizen of Argentina, and Appellee Mother, a citizen of the United States—until Father was deported in September 2015.  After the family moved to Argentina, Father and Mother separated.  In September 2017, Mother received permission from a court in Argentina to take the children back to the United States for 90 days.  After Mother's father died on December 3, 2017, Mother petitioned for an extension of time to keep the children abroad, but the Argentine court denied her request and ordered her to return the children by January 26, 2018.  Mother did not comply.

On August 2, 2018, Father filed a verified petition in Denton County district court under the 1980 Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention) and the International Child Abduction Remedies Act (ICARA), which implemented the treaty in the United States,[2] seeking S.E. and E.E.'s

---

[2]In its findings set out in the ICARA, Congress explained that

The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights.  Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.  The Convention provides a sound treaty framework to help resolve the

return to Argentina. *See* 22 U.S.C.A. §§ 9001–9011. In his petition, Father alleged that the children had been habitually resident in Argentina under article 3 of the Hague Convention and that the children were wrongfully removed from Argentina and wrongfully retained in the United States under articles 3 and 5 of the Hague Convention. He sought issuance of a show cause order to be served on Mother for a hearing and asked for permission to appear by video or telephonically if he could not obtain a humanitarian visa to enter the United States for the hearing. *See* Tex. Fam. Code Ann. §§ 152.001–.317.

Mother responded that the children's habitual residence was the United States—not Argentina—such that the Hague Convention did not apply. She further asserted that if the Hague Convention applied, then the "grave risk" exception—that the children's return would expose them to a grave risk of physical or psychological harm or otherwise place them in an intolerable situation—required the trial court to deny Father's request.

After a hearing that lasted several days, the trial court issued an order denying Father's petition. In his first issue, Father argues that the evidence is factually

---

problem of international abduction and retention of children and will deter such wrongful removals and retentions.

22 U.S.C.A. § 9001(a)(4). Argentina is also a signatory to the treaty. *See* Hague Conference on Private Int'l Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M. 225, 225 (1994), *available at* 1994 WL 327559.

insufficient to support the trial court's conclusion that there is a grave risk that returning the children would expose them to physical or psychological harm or would place them in an intolerable situation. In his second issue, Father argues that the evidence is legally insufficient to support the trial court's finding that there is no evidence of ameliorative measures or undertakings to reduce the grave risk of harm to the children. We will affirm without reaching either of these issues. *See* Tex. R. App. P. 47.1.

## II. Background

On August 28, 2018, the trial court started the hearing on Father's petition. Father appeared by video transmission (Skype) and through his attorney, and Mother appeared in person and through her attorney. The trial court heard evidence over the course of three days. After denying Father's petition, and upon his request, the trial court issued the following findings of fact:

1. Petitioner, [Father], is a citizen of Argentina.

2. Respondent, [Mother], is a citizen of the United States of America.

3. The parties lived in Ann Arbor, Michigan when the children the subject of this suit, S.G.E. and E.G.E., were born . . . .

4. [Father] was ordered to be removed or deported by the U.S. Immigration and Customs Enforcement on June 23, 2015 and cannot reenter the United States of America[] for a period of ten years.

5. On September 20, 2015, the parties and children moved to San Carlos de Bariloche, Argentina and established a residence.

6. In May of 2016, [Father] and [Mother] separated.

4

7. Upon separation, [Father] and [Mother] agreed to evenly divide the children's time in a fifty/fifty possession schedule in which each parent had the children for three and a half days every week.

8. The children lived in Argentina and attended school in Argentina in 2016 and 2017.

9. In August of 2017, pursuant to [Mother's] request, the Argentina court permitted her to travel to the United States of America with the children.

10. [Mother] traveled with the children on or about September 13, 2017 to the United States of America pursuant to the Argentinian court's order permitting the children to travel with her until December 10, 2017.

11. On December 6, 2017, [Mother] requested an extension of the time the children were permitted to remain in the United States.

12. On January 11, 2018, the Argentinian court denied that extension and ordered [Mother] to return the children to San Carlos de Bariloche, Argentina within fifteen days--by January 26, 2018.

13. [Mother] failed and refused to return the children to San Carlos de Bariloche, Argentina by January 26, 2018.

14. The children's habitual residence under the Hague Convention on the Civil Aspects of International Child Abduction when they were wrongfully retained in the United States of America was San Carlos de Bariloche, Argentina.

15. San Carlos de Bariloche, Argentina remains the habitual residence of the children.

16. [Father] and [Mother] did not intend to abandon the United States as the habitual residence of the children.

17. [Father] and [Mother] believed that [Father] would be able to legally reenter the United States within 2 to 2-1/2 years of his removal.

5

18. [Father] and [Mother] intended to return to the United States once [Father] was able to legally reenter.

19. [Father] had custody rights by operation of Argentinian law, by reason of Argentinian judicial or administrative decision, and by reason of agreement having legal effect under the law of Argentina.

20. [Father] was actually exercising his custody rights.

21. [Mother] wrongfully retained the children in the United States in violation of [Father's] custody rights which he was exercising.

22. [Father] commenced this proceeding less than one year before the date of wrongful retention.

23. There is a grave risk that returning the children to Argentina would expose the children to physical or psychological harm or would place the children in an intolerable situation.

24. Domestic violence did occur in Argentina.

25. The children witnessed several occurrence[s] of family violence.

26. The children witnessed [Father] cutting [Mother's] hair.

27. The children witnessed [Father] use corporal punishment on the dogs.

28. There is no evidence of ameliorative measures or undertakings that could be ordered or enforced by this Court to reduce the grave risk of harm to the children.

29. The request to return the children to Argentina should be denied.

30. [Father's] testimony was not credible.

The trial court issued nine conclusions of law, including that the children's habitual residence was San Carlos de Bariloche because they were acclimatized to life in Argentina, that Mother had wrongfully retained the children in violation of Father's

custody rights under Argentine law, and that there was a grave risk that returning the children to Argentina would expose them to physical or psychological harm or place them in an intolerable situation. The trial court's findings and conclusions also stated that any finding of fact that is a conclusion of law shall be deemed a conclusion of law and that any conclusion of law that is a finding of fact shall be deemed a finding of fact.

## III. Discussion

The Hague Convention's purpose is to protect children from the harmful effects of wrongful removal from the country of their habitual residence and to establish procedures to ensure their prompt return to that country by preserving the preremoval status quo of the parties' custody arrangements and deterring a parent from engaging in international forum shopping in child custody cases. *In re S.H.V.*, 434 S.W.3d 792, 797 (Tex. App.—Dallas 2014, no pet.); *In re J.J.L.-P.*, 256 S.W.3d 363, 368 (Tex. App.—San Antonio 2008, no pet.).

A petitioner seeking the return of a child under the Hague Convention must first establish by a preponderance of the evidence that the child has been wrongfully removed or retained within the Hague Convention's meaning. 22 U.S.C.A. § 9003(e)(1)(A). Under the Hague Convention, the removal or retention of a child is considered wrongful when, among other things, it is in breach of the rights of custody attributed to a person under the law of the country in which the child was "habitually resident" immediately before the removal or retention. Hague Conference on Private

7

Int'l Law, October 25, 1980, 19 I.L.M. 1501, 1501 (1980), *available at* 1980 WL 115586; *In re E.S.E.*, No. 06-18-00001-CV, 2018 WL 3040326, at *4 (Tex. App.—Texarkana June 20, 2018, no pet.) (mem. op.) (citing Hague Convention, art. 3, 19 I.L.M. 1501); *see Guimaraes v. Brann*, 562 S.W.3d 521, 534–35 (Tex. App.—Houston [1st Dist.] 2018, pet. filed) (referencing article 3 of the Hague Convention).

Once a petitioner has established that the retention or removal was wrongful and in violation of his custodial rights, the court must order the child's return to the child's country of habitual residence unless the respondent shows that one of the Hague Convention's four narrow exceptions applies. *Guimaraes*, 562 S.W.3d at 535. One of those narrow exceptions is the "grave risk" exception, which requires the respondent to show by clear and convincing evidence that there is a grave risk that the child's return would expose her to physical or psychological harm or otherwise place the child in an intolerable situation. *Id.*

Father challenges Fact Finding 23, in which the trial court stated that there is a grave risk that returning the children to Argentina would expose the children to physical or psychological harm or would place the children in an intolerable situation. And he challenges Fact Finding 28, in which the trial court stated that there is no evidence of ameliorative measures or undertakings that could be ordered or enforced by the trial court to reduce the grave risk of harm to the children.

When the appellate record contains a reporter's record, findings of fact on disputed issues are not conclusive and may be challenged for evidentiary sufficiency.

8

*Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126 (Tex. App.—Fort Worth 2016, no pet.). We defer to unchallenged fact findings that are supported by some evidence. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014). As an appellate court, we cannot make original fact findings; we can only "unfind" facts. *Tex. Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986); *AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 519 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). And we will not reverse a trial court's judgment because of an erroneous conclusion of law if the trial court rendered the proper judgment. *City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)); *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 513 (Tex. App.—Fort Worth 2012, no pet.). That is, because a trial court's conclusions of law are not binding on us, we will not reverse a trial court's judgment based on an incorrect conclusion of law when the controlling findings of fact support the judgment on a correct legal theory. *Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 679 (Tex. App.—Fort Worth 2015, no pet.). We defer to the trial court's factual determinations if they are supported by the evidence but review the trial court's legal determinations de novo. *E.S.E.*, 2018 WL 3040326, at *5.

Mother suggests that we may affirm the trial court's order denying Father's petition because—contrary to the trial court's Fact Findings 14 and 15 and Conclusions of Law 3 and 4—the children's habitual residence is the United States, not Argentina, such that the Hague Convention does not apply.

9

The Hague Convention does not define "habitual residence," which is a mixed question of law and fact. *Id.* Courts have defined "habitual residence" as a child's customary residence before her removal based on where the child has physically lived for an amount of time sufficient for acclimatization, with a degree of settled purpose from the child's perspective. *Id.* The case-by-case inquiry begins with the shared intent of those entitled to fix the child's residence at the latest time that their intent was shared, based on actions as well as declarations, and then requires a determination of whether the evidence "*unequivocally* points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent." *Id.* (emphasis added) (quoting *In re S.J.O.B.G.*, 292 S.W.3d 764, 779 (Tex. App.—Beaumont 2009, no pet.)); *J.J.L.-P.*, 256 S.W.3d at 373 ("[T]he habitual residence inquiry focuses on the child—not the parents."); *see also S.H.V.*, 434 S.W.3d at 797 ("The [Hague] Convention is based on the principle that the country of a child's habitual residence is best suited to determine questions of child custody and access."). That is, "[i]n relatively rare circumstances, . . . it is possible that the child's acclimatization to the location abroad will be so complete that serious harm to the child can be expected to result from compelling his return to the family's intended residence." *S.J.O.B.G.*, 292 S.W.3d at 780 (quoting *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005)); *see also Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001) (explaining that the first step toward

acquiring a new habitual residence is forming a settled intention to abandon the one left behind).

Father does not challenge Fact Findings 16, 17, and 18, in which the trial court found that Mother and Father did not intend to abandon the United States as the children's habitual residence, that they believed that Father would be able to legally reenter the United States within 2 to 2-1/2 years of his removal,[3] and that they intended to return to the United States once Father was able to legally reenter,[4] and

---

[3]Father acknowledged that when he signed the immigration and customs enforcement order that stated he had a 10-year bar from reentry into the United States, the ICE officer told him that because he and Mother were married and had two children, he might be able to return within 2.5 years and that Mother was present during that conversation. Mother testified that she and Father both believed after that meeting that they would be able to fight from Argentina to return the family to the United States and that they would be able to return to the United States within 2 to 2.5 years. Father complained during his testimony that Mother had not tried to learn Spanish and had not "socializ[ed] the best way, like -- like to show people that she -- she was really trying to stay, not leaving Argentina."

[4]Father had lived in the United States for 20 years and said that his business and his "whole life" was there prior to his deportation. Upon arriving in Argentina, Mother continued contacting U.S. officials for assistance with his immigration problem, stating that Father "kept harping on the I-212 about reentry after deportation." *See Martinez Alvarez v. Casita Maria, Inc.*, 269 F. Supp. 2d 834, 835 n.1 (N.D. Tex. 2003) (stating that an I-212 is "used to gain permission from the Attorney General to reapply for admission to the United States after deportation"), *appeal dism'd*, 86 F. App'x 781 (5th Cir. 2004). Mother testified that at one point while they lived in Argentina, Father grabbed the phone from her while she was talking with someone from a U.S. Senator's office and asked, "[W]hat are the steps that we need to take? How likely is it that this, you know, is going to happen before two years?" Father denied having spoken with any U.S. officials after his return to Argentina.

11

the evidence supports those findings.[5] While Father testified that the family's move to Argentina was a permanent move, the trial court found that his testimony was not credible, and Father does not challenge that finding. Accordingly, the record reflects that Mother and Father's last shared intent was for the United States to be the children's habitual residence. *See E.S.E.*, 2018 WL 3040326, at *5; *see also Mozes*, 239 F.3d at 1075–76 ("Whether there is a settled intention to abandon a prior habitual residence is a question of fact as to which we defer to the district court.").

With regard to whether the evidence "unequivocally points to the conclusion that the child[ren]" had acclimatized to living in Argentina and had therefore acquired a new habitual residence notwithstanding their parents' shared intent, *see E.S.E.*, 2018 WL 3040326, at *5, the sparse evidence presented by the parties about the children does not support the trial court's acclimatization conclusion.

S.E. was five years old and E.E. was four years old when the family moved to Argentina in September 2015. They lived there until September 2017, and during that time, they attended a private bilingual school. The trial court heard no testimony from the children.

_____

[5]Mother said that Father continued to handle sales for his United States-based business via a Michigan phone number, and he and Mother maintained all of their U.S. bank accounts. *See Papakosmas v. Papakosmas*, 483 F.3d 617, 624 (9th Cir. 2007) ("The ongoing business venture in the United States . . . [is an] objective factor[] weighing in favor of finding that there was no mutual intent to abandon completely the family's residence in California."). Father said that he had sold the business to his best friend, that he still helped "here and there," and that he had both a Michigan phone number and an Argentine phone number.

Father testified that the children started practicing their Spanish in September 2015 when they arrived in Argentina and started school. He said that they went to a summer camp in January 2016 to learn Spanish. Father claimed that the children spoke Spanish 60–70% of the time and that they spoke English at home but Spanish with their friends and outside the home at ski classes, swimming classes, and birthday parties. Father said that his parents and his sister and brother-in-law and their two children lived in Argentina and would visit the family in San Carlos de Bariloche five or six times a year.

The trial court admitted into evidence a video Father had made that showed the children skiing and swimming and showed some children at a birthday party; Father acknowledged on cross-examination that 10% of the video was shot while they lived in Michigan, but he did not indicate which parts. Most of the video is set to music, and there is virtually no dialogue in either English or Spanish.

Mother testified that S.E. had a speech problem and had been in speech therapy in the United States since she was one-and-a-half years old. She stated that one of the letters they had submitted to show deportation hardship was from S.E.'s speech therapist, and Mother explained her concern about immersing S.E. in a new language because they had been asked not to speak Spanish at home to keep from interfering with her speech therapy. Mother did not speak Spanish.

Mother said that when they moved to Argentina, the children became more babyish and attached to her, and S.E. had started wetting the bed, which she had

13

never done before. Mother testified that the children cried every night because they wanted to go back home to the United States and because they did not like Argentina.

Mother's friend Hugh Sinclair, a British expatriate who lived in San Carlos de Bariloche and who helped Mother and the children before they returned to the United States, testified from Argentina that when S.E. and E.E. played with his children, "the language of choice was definitely English." Mother's friend Maria Julia Castagneto, an English teacher, testified from Argentina that her twin six-year-old children were in the same kindergarten with S.E. and E.E. and that E.E. had been constantly sick and S.E. had been constantly crying, had been very unhappy, and did not adapt well.

Mother said that the children did not adjust well during the time the family lived together or before she moved into a guest house on the same property "because [they] were stuck in the middle of nowhere, with no car" when Father would go on various trips, and it was a dangerous 45-minute walk to a gas station. Mother described the journey, stating, "[I]f we did want to venture out and take a stroll, we would have to carry satchels of rocks or sticks to throw at dogs that would come to attack us, so I never really even felt comfortable leaving."

After Mother and Father separated in May 2016, they agreed to a 50-50 child possession schedule. At first, Mother lived in a guest house on the same property as the family home, but from September 2016 to September 2017, she lived in several different places in San Carlos de Bariloche, renting furnished apartments based on what she could afford to pay as a nonresident alien. Father acknowledged that "when

14

the high season comes, you know, the prices are raised, so you have to look for a different place to stay" because San Carlos de Bariloche was "a very touristic place."

Mother testified that until she moved out, the children had been with her "24/7," and after she moved, Father fulfilled their informal possession arrangement around 70% of the time. Father explained the 50-50 possession schedule based on the children's school as an exchange point: he would pick the children up from Mother on Sunday, take them to school on Monday and Tuesday, and then Mother would pick them up after school on Tuesday and take them Wednesday and Thursday, then he would pick them up from school on Thursday, and Mother would pick them up on Friday and have them on Saturday.

Mother said that while she lived in the guest house, the children did not want to go to the main house and wanted to sleep with her. And Father did not have any interest in them coming to the main house for the first 6 months of the separation while she was in the guest house because "[h]e had a very active social life." Mother said that the first night after she moved into the guest house, Father brought a woman home to spend the night; she and the children were aware of this because he was very open about it. Mother said that Father basically abandoned his children during this time, even though they did not speak the language and were having a very difficult time adjusting. Mother said that things improved when she moved from the guest house and into the city center.

Father attached to his verified petition for return of the children the Argentine court's order that granted Mother permission to travel with the children.[6] The Argentine court observed, "It is undeniable that the [children] were born in the United States of America . . . and that that is the country where they have strong bonds of origin that must be preserved." The Argentine court also observed that after having the children interviewed, "It is clear from the report and the records that the [children] want to travel to the United States, that they miss [it] a lot *and that they have stronger ties there* than those generated in [Argentina]." [Emphasis added.]

As set out above, the evidence in the record does not unequivocally support the trial court's determination that the children had acclimatized to life in Argentina such that Argentina had become their habitual residence. *See id.*; *cf. S.H.V.*, 434 S.W.3d at 799 (holding that when younger child was born in Panama and lived there for 4 years and older child had lived in Panama for 6 years, trial court did not abuse its discretion by concluding that children's 5 months in the United States had not led to acclimatization and a new habitual residence); *J.J.L.-P.*, 256 S.W.3d at 373 (observing that during J.J.L.-P.'s sixteen months in Mexico, he engaged in the usual day-to-day activities of a child his age and established substantial ties between himself and Mexico, including attending school and participating in after-school activities, having

---

[6]Under ICARA, any documents included with a petition seeking relief under the Hague Convention do not have to be authenticated in order to be admissible in court. 22 U.S.C.A. § 9005.

16

regular contact with family and friends who lived nearby, and becoming familiar with the culture and geography of Guadalajara and Mexico through his weekend travels with his father).

That is, the record does not reflect by a preponderance of the evidence that the children had adapted well to life in Argentina, that they had become familiar with Argentina's culture and geography, that they had otherwise established substantial ties to Argentina, or that they had engaged in what might be the usual day-to-day activities of four-year-old and six-year-old Argentinian children. *Cf. Mozes*, 239 F.3d at 1078 ("Most agree that, given enough time and positive experience, a child's life may become so firmly embedded in the new country as to make it habitually resident even though there [are] lingering parental intentions to the contrary."). Here, the record reflects the children were fairly isolated for several months before Mother moved out of the guest house, that they spent more than half their time living in several different residences with Mother before returning to the United States with her,[7] that they spoke English with Sinclair's children, and that they attended a bilingual school.

---

[7]Mother had lived in Texas when she met Father in Michigan in 2009, and she transferred to a school in Michigan to be with him. Mother testified that Father had promised her at least two trips a year to Texas if they moved to Argentina, and Father acknowledged that when they lived in Michigan, they would travel twice a year to Texas to visit her family. Mother also testified that before the move, she had left behind in the United States "items that were very special to [her]," like things that the children had made in preschool, pictures that were special to her from her childhood, scrapbooks, and "the very few expensive jewelry items" that she had.

17

Based on the record before us, we affirm the trial court's judgment because the trial court entered the correct judgment but for the wrong legal reason. The trial court found in Fact Findings 16, 17, and 18, which were uncontroverted and supported by evidence, that the habitual residence of the children before leaving the United States was the United States and that the parents did not intend to abandon the United States as that habitual residence, i.e., their last shared intent. The United States habitual residence status was not superseded by the children's subsequent acclimatization to Argentina, as there was insufficient evidence to support such a finding.[8] Accordingly, the trial court entered the proper judgment but for the wrong legal reason. *See Whittington*, 384 S.W.3d at 779 n.10; *H.E.B., L.L.C.*, 369 S.W.3d at 513; *see also Wise Elec. Coop., Inc.*, 476 S.W.3d at 679. We overrule Father's two issues without reaching their merits. *See* Tex. R. App. P. 47.1.

---

Mother and the children had lived in Denton since their return to the United States in 2017, first staying with Mother's mother and brother and then in a separate residence since February 1, 2018. The children were enrolled in school in Denton at the time of the hearing in August 2018.

[8]Father complains that we cannot consider Mother's "habitual residence" argument as a basis for affirming the trial court's judgment because she did not file her own notice of appeal. *Cf.* Tex. R. App. P. 25.1(c) (stating that a party who "seeks to alter the trial court's judgment or other appealable order must file a notice of appeal" and that the court cannot grant a party who does not file a notice of appeal more favorable relief than the trial court did except for just cause). But Mother's argument does nothing to alter the trial court's judgment denying Father's petition nor increase Mother's relief on appeal. Rather, the trial court made conflicting fact findings—in addition to an erroneous legal conclusion with regard to the children's habitual residence and acclimatization—and some of the unchallenged findings support affirming the trial court's order denying Father's petition.

18

## IV.  Conclusion

Because the trial court rendered a proper judgment, we affirm the judgment.


/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered:  August 1, 2019